IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 17 EAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court entered on |
| | : | September 20, 2023, at No. 980 |
| v. | : | EDA 2021, affirming the Order of |
| | : | the Court of Common Pleas of |
| | : | Philadelphia County, Criminal |
| NATHANIEL WILLIAMS, | : | Division, entered on April 22, 2021, |
| | : | at No. MC-51-CR-0030428-2019. |
| Appellee | : | |
| | : | ARGUED: September 10, 2024 |

## OPINION

**JUSTICE DOUGHERTY**                                     **FILED: February 19, 2025**

In this case the Commonwealth charged a police detective with multiple criminal offenses related to his alleged abuse of his position. Specifically, the Commonwealth alleged the detective assisted his cousin in stalking a woman and subsequently attempted to coverup his misconduct. But the lower courts — including the preliminary hearing court, the court of common pleas, a three-judge panel of the Superior Court, and the Superior Court *en banc* — concluded the Commonwealth failed to produce *prima facie* evidence to support any of the charges against the detective and so dismissed the case. We granted allowance of appeal to consider whether this legal conclusion, which was grounded in part on the lower courts' interpretation of the relevant criminal statutes, was correct. We hold it was not. Accordingly, we reverse the order of the Superior Court and remand for further proceedings.

On October 14, 2017, at about noon, Theresa Williams was in the parking lot of a store when Edwin Williams approached her.[1] Edwin asked Theresa for her phone number and if she was interested in going out with him. He also mentioned that he was married and worked as a bus driver for the Southeastern Pennsylvania Transportation Authority (SEPTA). Theresa told Edwin she wasn't interested, and he walked off. Theresa got into her car and began to back up. Edwin pulled up behind her and looked in the direction of her car. He then drove away. Theresa never told Edwin where she lived, and she was not interested in him going to her house. That same day, Edwin exchanged text messages with defendant, who at the time was a detective in the Homicide Division of the Philadelphia Police Department.[2]

Three days later, on October 17, 2017, there were additional text messages between defendant and Edwin at 3:06, 3:07, 3:12, and 3:13 p.m., and then later at 7:41 p.m. In the interval between the initial texting and the texting in the early evening, defendant used several police databases to perform computer searches related to Theresa. Specifically, at 3:35 p.m., defendant searched Theresa's license plate number in the National Crime Information Center (NCIC) system;[3] at 3:36 p.m., he searched her

---

[1] We henceforth refer to Theresa Williams and Edwin Williams by their first names to avoid confusion. Edwin and appellee Nathaniel Williams (defendant) are cousins, but Theresa is not related to either man.

[2] Previously, between March 5, 2017 and October of 2017, there were 20 phone calls and 182 text messages between defendant and Edwin.

[3] "The NCIC is an electronic clearinghouse of criminal data that can be accessed by most criminal justice agencies nationwide, to assist in the apprehension of fugitives, locate missing persons, recover stolen property, and identify terrorists." *Commonwealth v. Santiago*, 209 A.3d 912, 915 n.3 (Pa. 2019).

address in the VOTE system;[4] and at 3:42 pm, he searched her name in the Pennsylvania Justice Network (JNET) system.[5]

On October 21, 2017, Theresa was at home with her children when Edwin knocked on her door. She opened the door and asked him how he found her. Edwin replied that he "had his ways." N.T. Preliminary Hearing, 9/11/20, at 14. Theresa wanted him to leave so her children wouldn't get upset but he refused. Eventually, to encourage him to leave her alone, she asked him to write his phone number down on a piece of paper. Edwin did so and left.

Over the next few days, Edwin left a greeting card for Theresa on her car. The card stated:

> Hi Ms. T. It's me. I'm still thinking about you. P.S. hello. . . .
>
> It's just me with a little hi. P.S. hello. Just in case you're feeling like texting me, calling me or going out with me. Sometimes being persistent pays off and nothing beats a failure but a try. And at least you know I don't lie.

*Id.* at 19. He also left roses for her on her car. There were text messages between Edwin and defendant on October 18, 21, 22, 23, and 28, and phone calls between the men on October 27 and November 5.

Theresa filed a formal written complaint about Edwin with the SEPTA police. She also submitted an email complaint to the Philadelphia police. Lieutenant James Clough of the Internal Affairs Division (IAD) of the Philadelphia Police Department was assigned to investigate the matter. On November 24, 2017, Lieutenant Clough interviewed Edwin.

---

[4] The VOTE system identifies the registered voter(s) living at a particular address.

[5] "JNET's integrated justice portal provides a unified online platform for authorized users to access crucial public safety and criminal justice information from various municipal, county, state, and federal agencies." https://www.pa.gov/en/agencies/jnet.html (last visited Jan. 13, 2025).

Edwin claimed he really did not know defendant, and he had never spoken to him on the phone or texted with him. That same day, defendant replaced his phone.

On December 27, 2017, Lieutenant Clough took a statement from defendant. The statement noted at the outset that it was being taken at IAD and concerned an IAD investigation. Thereafter in his statement, defendant claimed he was investigating a homicide that occurred on Williams Avenue when he saw the target of his investigation, Tashaun Curtis, get into a car on the 6600 block of Ogontz Avenue. He told the Lieutenant the case number of the Williams Avenue homicide: M17-185. Defendant alleged that on October 17, 2017, he conducted a computer search of the license plate number for this car, which indicated Theresa was the registered owner. In addition, he searched Theresa "every way [he] could to establish a connection to Tashaun Curtis[,]" including in the VOTE and JNET systems. N.T. Refiling Hearing, 4/22/21, at 42. However, he was unable to connect Theresa with Curtis. Defendant insisted his searches on the VOTE and JNET systems were conducted for business rather than personal reasons. He acknowledged Edwin was his cousin but claimed he had not spoken to him for "maybe a year or more." *Id.* at 36, 47. In particular, he denied disseminating Theresa's motor vehicle and voter registration information to Edwin.

Defendant signed each page of the statement. His signature on the final page attested he had read the entire statement, and that it was true and correct to the best of his knowledge.

Immediately after interviewing defendant, Lieutenant Clough went to the Homicide Division of the Philadelphia Police Department. From the parking lot, he called an officer in the Homicide Division and requested the homicide file for the murder on Williams Avenue. He then went inside to the Homicide Division and retrieved the file, which consisted of one folder. Back at IAD, Lieutenant Clough inspected the contents of the

folder.  Nothing in the folder contained any reference to Theresa.  The next day, however, defendant informed IAD there was a second folder in the file of the Williams Avenue homicide.  This folder contained a printout of a publicly available Facebook photograph of Theresa and her children.  On the back of the printed photograph were handwritten notes of Theresa's name and license plate number, as well as the following handwritten notations: "no record/no wants," "75-48A negative," "no friends shared," "autism supporter," "poss,"[6] and "neighbors."  N.T. Preliminary Hearing, 9/11/20, at 78-79.  This was the only item in the folder referencing Theresa, and the only item with handwritten notes on it.

The Commonwealth subsequently charged defendant with four counts of unsworn falsification to authorities,[7] and one count each of tampering with or fabricating physical evidence,[8] tampering with public records or information graded as a felony of the third

---

[6] "Poss" is an abbreviation for "possibly."  *See* N.T. Preliminary Hearing, 9/11/20, at 78.

[7] *See* 18 Pa.C.S. §4904(a) ("A person commits a misdemeanor of the second degree if, with intent to mislead a public servant in performing his official function, he: (1) makes any written false statement which he does not believe to be true; (2) submits or invites reliance on any writing which he knows to be forged, altered or otherwise lacking in authenticity; or (3) submits or invites reliance on any sample, specimen, map, boundary mark, or other object which he knows to be false.").

[8] *See* 18 Pa.C.S. §4910 ("A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he: (1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation; or (2) makes, presents or uses any record, document or thing knowing it to be false and with intent to mislead a public servant who is or may be engaged in such proceeding or investigation.").

degree,[9] and obstructing administration of law or other governmental function.[10]   On September 11, 2020, the Commonwealth amended the charges to include only one count of each offense.  A joint preliminary hearing for defendant and Edwin was then conducted before the Honorable William Meehan of the Philadelphia Municipal Court.  Ultimately, the preliminary hearing court held co-defendant Edwin for court but dismissed the charges against defendant for lack of evidence.

On September 17, 2020, the Commonwealth filed a notice of refiling of criminal complaint.[11]  The Commonwealth requested to reinstate the dismissed charges and also add a charge of official oppression.  The Honorable Crystal Bryant-Powell of the Philadelphia Court of Common Pleas presided over the refile hearing, which was held on April 21, 2021.  The Commonwealth moved into evidence the transcript of the preliminary hearing held on September 11, 2020.  Subsequently, during argument, the

---

[9] *See* 18 Pa.C.S. §4911(a) ("A person commits an offense if he: (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government; (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or (3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing."); *id.* at §4911(b) ("An offense under this section is a misdemeanor of the second degree unless the intent of the actor is to defraud or injure anyone, in which case the offense is a felony of the third degree.").

[10] *See* 18 Pa.C.S. §5101 ("A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.").

[11] *See* Pa.R.Crim.P. 544(a) ("When charges are dismissed or withdrawn at, or prior to, a preliminary hearing, or when a grand jury declines to indict and the complaint is dismissed, the attorney for the Commonwealth may reinstitute the charges by approving, in writing, the re-filing of a complaint with the issuing authority who dismissed or permitted the withdrawal of the charges.").

Commonwealth conceded it failed to demonstrate a *prima facie* case of official oppression. In the end, the court ruled "the Commonwealth has failed to demonstrate the elements of the crimes based on a preponderance of the evidence and the motion to re-file is denied." N.T. Refiling Hearing, 4/22/21, at 77.

In its opinion, the refile court explained "the Commonwealth failed to meet its burden of establishing a *prima facie* case on any of the charges[.]" Trial Court Op., 10/18/21, at 8. First, with respect to the charge of unsworn falsification to authorities, the court determined the Commonwealth failed to make out a *prima facie* case that defendant had the intent to mislead a public servant in performing his official function, or that he made a written false statement which he did not believe to be true. Regarding the charge of tampering with or fabricating physical evidence, the court argued the evidence did not support a *prima facie* case that defendant "did any of the required elements of the statute 'believing that an official proceeding or investigation is pending or about to be instituted[.]'" *Id.* at 8-9, *quoting* 18 Pa.C.S. §4910. Next, the court reasoned that "not only does the evidence presented fail to make a *prima facie* case for the required elements of" tampering with public records or information, "it is also hard to fathom that even viewed in its best light for the Commonwealth, that the legislative intent of this statute was intended to address any of" defendant's alleged conduct. *Id.* at 9. Lastly, the court concluded the evidence did not support the charge of obstructing the administration of law or other governmental function because the Commonwealth did not prove obstruction or the required means of force, violence, physical interference or obstacle, breach of official duty, or other unlawful act.

On the Commonwealth's appeal to the Superior Court, a three-judge panel initially affirmed. Thereafter, however, the Superior Court granted the Commonwealth's request for reargument and withdrew its prior decision. On September 20, 2023, the court *en*

*banc* again affirmed, in a published, split decision.[12]  The majority opinion noted that for a defendant to be held for court at the preliminary hearing stage, "the Commonwealth bears the burden of establishing at least a *prima facie* case that a crime has been committed and that the accused is probably the one who committed it."  *Commonwealth v. Williams*, 302 A.3d 1238, 1243 (Pa. Super. 2023) (*en banc*), *quoting Commonwealth v. Perez*, 249 A.3d 1092, 1102 (Pa. 2021).  The majority continued:

> A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense.  The evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury.  The weight and credibility of the evidence are not factors at the preliminary hearing stage, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense.

*Id.*, *quoting Perez*, 249 A.3d at 1102 (cleaned up).

Applying these standards, the majority first held "[t]he trial court did not err in finding that the Commonwealth failed to establish a *prima facie* case of unsworn falsification to authorities."  *Id.* at 1244.  The majority determined defendant's interview with Lieutenant Clough, "which was conducted as an oral interview, memorialized in writing by . . . Clough, and signed by [defendant], does not constitute a 'written false statement,' under the statute."  *Id.*

Next, the majority concluded the trial court did not err in dismissing the charge of tampering with or fabricating physical evidence, reasoning as follows:

> The Commonwealth failed to present *prima facie* evidence that the information regarding Theresa was added to the file after [defendant] learned of the Internal Affairs Division's investigation.  Rather, the . . .

---

[12] The majority opinion was authored by Judge McLaughlin and joined by then-President Judge Panella, then-Judge, now President Judge Lazarus, Judge Nichols, and then-Judge, now Justice, McCaffery.  The dissenting opinion was authored by Judge Olson and joined by President Judge Emeritus Bender and Judges Stabile and Dubow.

detective merely testified he retrieved the file, and the prosecution presented no testimony from anyone that he obtained the entire file when he initially procured it. That the second file was not included with the first is not evidence, even at a *prima facie* level, that the material was added after Williams learned of the investigation.

*Id.* at 1245.

Turning to the charge of tampering with public records or information, the majority likewise concluded this charge was properly dismissed. The majority acknowledged the file for the Williams Avenue homicide was a "public record or thing . . . as contemplated by" Section 4911(a). *Id.* at 1246 (quotation marks omitted). Nonetheless, it held the Commonwealth failed to present a *prima facie* case that defendant made a false entry or alteration to the file. According to the majority, defendant simply "added his own notes and computer printouts to the file[,]" and the Commonwealth's argument that he falsified the second folder was "mere supposition and speculation." *Id.* at 1247.

Finally, the majority ruled the Commonwealth failed to adduce a *prima facie* case of obstructing administration of law or other governmental function. The majority reasoned that "mere lying" during a police interview or "add[ing] information to the homicide file" would not constitute an "unlawful act" for purposes of Section 5101. *Id.* at 1248. "Moreover," the majority contended, "because the Commonwealth did not establish a *prima facie* case for the other crimes charged, those charges do not meet the 'any other unlawful act' catchall provision. Although the Commonwealth maintains the alleged addition to the homicide file was a breach of official duty, it has provided no legal authority to support this claim, and we are aware of none." *Id.*

The dissent, in contrast, argued the Commonwealth presented sufficient evidence at the preliminary hearing stage to hold defendant for court on all four charges. It criticized the majority for applying a "more stringent standard" for a *prima facie* case than the one provided by "well-settled law." *Id.* at 1248 (Olson, J., dissenting). In the dissent's view, the majority erroneously required the Commonwealth "to disprove or rebut interpretations

of the evidence that favor [defendant], even when the evidence presented provides for a reasonable inference that a crime was committed and that [defendant] was the person who probably committed the crime." *Id.*

Regarding the specific offenses, the dissent contended the trial court erred as a matter of law in dismissing the unsworn falsification charge. The dissent disagreed with the majority that defendant's statement to Lieutenant Clough was not a "written statement" for purposes of Section 4904(a). It found "nothing in the language of the statute that requires the defendant to be the actual scrivener of the written statement at issue[,]" and insisted defendant's signing of each page of the statement and his attestation at the conclusion of the statement that it was true and correct to the best of his knowledge "ma[d]e the statement [defendant's] own." *Id.* at 1253. Moreover, the dissent contended the Commonwealth established a *prima facie* case that defendant's written statement included false information. In particular, the dissent argued there was *prima facie* evidence defendant was untruthful when he claimed in the statement that he had not spoken with Edwin for a year or more, and also when he claimed that he obtained Theresa's personal information as part of a homicide investigation rather than to provide this information to Edwin.

The dissent likewise maintained the charge of tampering with or fabricating physical evidence should not have been dismissed. "When viewed in a light most favorable to the Commonwealth," the dissent submitted, "the evidence and all reasonable inferences drawn therefrom support a *prima facie* case that [defendant] altered the homicide file by creating a second folder with [Theresa's] photograph and personal information to mislead and thwart an official investigation." *Id.* at 1256.

Similarly, the dissent found error in the trial court's dismissal of the charge of tampering with public records or information. In this regard, the dissent argued:

I believe that it is more likely than not that [defendant] used official computer systems to help Edwin locate [Theresa] then tried to cover it up by manipulating a government record to make it appear as if [Theresa] were involved in a murder investigation. [Defendant] acted intentionally to create a second folder as part of the M17-185 homicide investigation file to deceive Lieutenant Clough and mislead him to believe that his purpose for accessing these systems was legitimate. I acknowledge [defendant] gave an innocent explanation for his actions; however, it is not proper at this stage of the proceedings to rely on [defendant's] self-serving statements and completely disregard the evidence that reasonably leads to the conclusion [defendant] tampered with public records in violation of [Section 4911(a)].

*Id.* at 1258.

The dissent also insisted the final charge of obstruction was supported by *prima facie* proof and therefore erroneously dismissed. The dissent maintained that since the Commonwealth established a *prima facie* case for the other crimes charges, and "[s]ince there [wa]s no question that Lieutenant Clough was engaged in the administration of a governmental function while investigating [defendant], all of the elements of Section 5101 were met." *Id.* at 1259.

This Court granted the Commonwealth's petition for allowance of appeal, rephrasing the issues for clarity as follows:

(1) Did the Superior Court err in holding that a signed and initialed transcription of a police interview is not a "written statement" for purposes of establishing a *prima facie* case of unsworn falsification to authorities under 18 Pa.C.S. §4904?

(2) Did the Superior Court err in holding that the Commonwealth failed to establish a *prima facie* case of obstructing administration of law or other governmental function under 18 Pa.C.S. §5101?

(3) In holding that the evidence was insufficient to establish a *prima facie* case of tampering with or fabricating physical evidence, 18 Pa.C.S. §4910, and tampering with public records or information, 18 Pa.C.S. §4911, did the Superior Court fail to evaluate the evidence under the correct standard of review?

*Commonwealth v. Williams*, 315 A.3d 841 (Pa. 2024) (*per curiam*). These issues raise "pure question[s] of law involving statutory interpretation," so "our scope of review is

plenary and our standard of review is *de novo*." *Commonwealth v. Gamby*, 283 A.3d 298, 304 (Pa. 2022); *accord Perez*, 249 A.3d at 1102 (whether the evidence is sufficient to establish a *prima facie* case is a question of law).

"The preliminary hearing is not a trial." *Perez*, 249 A.3d at 1102, *quoting Commonwealth v. McBride*, 595 A.2d 589, 591 (Pa. 1991). The purpose of a criminal trial is to determine the guilt or innocence of the accused. "The principal function of a preliminary hearing[,]" on the other hand, is to "protect an individual's right against an unlawful arrest and detention." *Id.*, *quoting McBride*, 595 A.2d at 591. Thus, "[a]t the preliminary hearing stage of a criminal prosecution, the Commonwealth need not prove the defendant's guilt beyond a reasonable doubt, but rather, must merely put forth sufficient evidence to establish a *prima facie* case of guilt." *Commonwealth v. Karetny*, 880 A.2d 505, 513-14 (Pa. 2005). "A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense." *Perez*, 249 A.3d at 1102, *quoting Karetny*, 880 A.2d at 514.[13] Under this formulation, "'a prima facie case' entails a mere determination of probable cause[.]" *Talley*, 265 A.3d at 517. Put

---

[13] Our caselaw through the years has included "various articulations" of the *prima facie* standard. *Commonwealth v. Harris*, 315 A.3d 26, 34 n.7 (Pa. 2024). However, both parties appear to agree with the foregoing formulation. *See* Commonwealth's Brief at 16 ("A *prima facie* case exists where the evidence establishes each of the material elements of the crime charged and sufficient probable cause to warrant the belief that the accused committed the offense.") (quotation marks and citation omitted); Appellee's Brief at 25 ("To establish a *prima facie* case against a defendant, the Commonwealth . . . must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial and accepted as true, the judge would be warranted in allowing the case to go to the jury."). Moreover, the weight of authority appears to support this articulation of the *prima facie* standard. *See, e.g.*, *Commonwealth v. Talley*, 265 A.3d 485, 517 (Pa. 2021); *Commonwealth v. Montgomery*, 234 A.3d 523, 533 (Pa. 2020); *Commonwealth v. Weigle*, 997 A.2d 306, 311 (Pa. 2010); *Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005); *Commonwealth v. Huggins,* 836 A.2d 862, 866 (Pa. 2003); *Commonwealth v. McBride*, 595 A.2d 589, 591 (Pa. 1991). Accordingly, for purposes of this appeal, we too apply this formulation.

simply, "probable cause 'is a reasonable ground for belief of guilt.'" *Commonwealth v. Sangricco*, 379 A.2d 1342, 1343 (Pa. 1977), *quoting McCarthy v. DeArmit*, 99 Pa. 63, 69 (1881). In assessing whether a *prima facie* case has been demonstrated, "[i]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." *Perez*, 249 A.3d at 1102, *quoting Huggins*, 836 A.2d at 866. Moreover, "[t]he weight and credibility of the evidence are not factors at the preliminary hearing stage[.]" *Id.*

Having explicated the legal principles governing our analysis, we now consider whether the Commonwealth established a *prima facie* case as to each of the four charged offenses.

### Unsworn Falsification to Authorities

A defendant is guilty of unsworn falsification to authorities "if, with intent to mislead a public servant in performing his official function, he . . . makes any written false statement which he does not believe to be true[.]" 18 Pa.C.S. §4904(a)(1). In other words, a defendant is guilty of unsworn falsification under Section 4904(a)(1) if: (1) he makes a written false statement, (2) which he does not believe to be true, and (3) he does so with intent to mislead a public servant in performing his official function.

The Commonwealth contends the *en banc* majority's holding that the evidence was insufficient to hold defendant for court for unsworn falsification "defies logic" and "this Court's precedent." Commonwealth's Brief at 17. It argues that while "the Superior Court majority's one-sentence analysis implies that the transcript of defendant's interview [with Lieutenant Clough] was not a 'written false statement,' the court's actual holding can logically only be understood as one concluding that defendant did not personally 'make' the statement." *Id.* at 18. Indeed, the Commonwealth insists it is indisputable the

interview was reduced to writing and constituted a statement, *i.e.*, a representation. Thus, it argues the majority's true holding is that defendant did not "make" the statement because Lieutenant Clough "was the person who physically reduced defendant's words to writing." *Id.* And in so holding, the Commonwealth posits, the majority contravened its own decision in *Commonwealth v. Cherpes*, 520 A.2d 439, 444 (Pa. Super. 1987) (finding evidence sufficient to support conviction of unsworn falsification to authorities where witness testified, contrary to Cherpes's claim otherwise, that Cherpes signed financial disclosure form which failed to disclose certain income from his insurance business). It also perceives "direct tension" between the majority's holding and this Court's decision in *Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992) (holding prior inconsistent statement of non-party witness is admissible as substantive evidence if statement was given under oath at formal legal proceeding, reduced to writing signed and adopted by witness, or contemporaneous verbatim recording). *Id.* Moreover, the Commonwealth maintains "[d]efendant knew that his statement that he had not spoken with his cousin Edwin in almost a year was false because his phone records showed that they had communicated with each other merely two months earlier[.]" *Id.* at 19. It contends too that it may be reasonably inferred based on the totality of the evidence that defendant lied in his statement with the express objective of misleading Lieutenant Clough in performing his IAD investigation.

Defendant responds that even assuming he made false statements to Lieutenant Clough when he claimed to have not spoken to Edwin in a year and denied giving him Theresa's personal information, the evidence was still insufficient because it did not show he made a written statement as required by Section 4904(a)(1). He argues he "did not write the statement[,]" and as such, did not "make" the statement as required under the statute. Appellee's Brief at 15. According to defendant:

the statute was not broadly drafted to encompass the acts of adopting, affirming or endorsing a written statement. Rather, it was narrowly drawn to criminalize only the act of making a false written statement. Since it is a basic canon of statutory interpretation that a court may not insert a word into a statute where the legislature itself has failed to do so, . . . this Court should reject the Commonwealth's improper invitation to extend the scope of 18 Pa.C.S. §4904 to statements that were not made in writing by the defendant himself.

*Id.* (citation omitted). He adds that "[i]f the legislature had wished to criminalize the making of a verbal statement to a public servant, it would have written the statute to penalize the making of any 'oral or written false statement' as it has done in other instances." *Id.* at 16 n.4. Furthermore, defendant submits the Commonwealth's reliance on *Cherpes* is misplaced. In his view, the takeaway principle from *Cherpes* is not that the Commonwealth may satisfy its burden of proof in the absence of evidence the defendant personally made the written statement, but rather that witness credibility is the exclusive province of the fact-finder, and thus the jury was free to reject Cherpes's testimony that he did not sign the statement in favor of the witness's testimony that he did.

We conclude the Commonwealth presented *prima facie* proof of each of the three elements of unsworn falsification to authorities under Section 4904(a)(1). Reading the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences in its favor, there is probable cause to believe defendant: (1) made a written false statement, (2) which he did not believe to be true, and (3) that he did so with intent to mislead a public servant in performing his official function.

Initially, the first element of unsworn falsification — the making of a written false statement — is satisfied at the *prima facie* level. The word "makes" is not defined in the statute or elsewhere in the Crimes Code, nor has it acquired a particular and appropriate meaning. Hence, this word is construed according to its common and approved usage. *See* 1 Pa.C.S. §1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and

phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition."). "The common and approved meaning of a word . . . is appropriately gleaned from dictionary definitions." *Commonwealth v. Chisebwe*, 310 A.3d 262, 269 (Pa. 2024). The verb "make" is pertinently defined as "to produce; cause to exist or happen; bring about[.]"[14]

Presently, defendant caused a written statement to exist by giving oral answers, which were then transcribed by Lieutenant Clough, and by signing each page of the statement and signing it at the end in attestation that its contents were accurate.[15] Defendant's signatures on the transcription brought about a written statement as defined by Section 4904(a)(1); without them, the statement would not exist. To be sure, as defendant emphasizes, he did not physically write every word of the statement. Only the signatures were actually supplied by his hand. But the statute does not require the defendant to be the sole or even a scrivener of the written statement. Its application is not limited to only those circumstances where the defendant "drafts" the written statement. Rather, Section 4904(a)(1) uses the broader verb "makes," which encompasses defendant's actions in supplying the contents of the statement and then adopting it as his own.[16]

---

[14] *Make*, Dictionary.com, https://www.dictionary.com/browse/make (last visited Jan. 21, 2025).

[15] Defendant's statement is, of course, written, as defendant acknowledges. *See* Appellee's Brief at 13 ("Lieutenant Clough memorialized the conversation in writing[.]").

[16] As defendant correctly observes, in adopting Section 4904(a)(1) the General Assembly plainly did not seek to criminalize the making of an oral false statement to a public official. *See* Appellee's Brief at 16 n.4. Our interpretation herein is not to the contrary. We merely recognize that one who adopts a written statement — regardless of whether the written statement is derived from or an exact transcription of oral statements — "makes a written statement" for purposes of Section 4904(a)(1).

Moreover, there is *prima facie* evidence the written statement defendant made is false. Indeed, the statement, viewed in the light most favorable to the Commonwealth, as it must be, appears to contain multiple untruths. For example, defendant claimed in the statement he had not spoken to Edwin for "maybe a year or more." N.T. Refiling Hearing, 4/22/21, at 36. However, telephone records show twenty phone calls between the men from March 5, 2017 to October of 2017; calls or attempted calls between them on October 6, 7, and 8 of 2017; and calls on October 27 and November 5, 2017. *See* N.T. Preliminary Hearing, 9/11/20, at 87-88.[17] In addition, defendant told Lieutenant Clough he searched for Theresa on the VOTE and JNET systems on October 17, 2017 for business rather than personal reasons. *See* N.T. Refiling Hearing, 4/22/21, at 41-42. Yet, defendant and Edwin exchanged text messages three days earlier, when Edwin first encountered Theresa, as well as just minutes before defendant actually performed the searches. *See* N.T. Preliminary Hearing, 9/11/20, at 87-88. The timing of these communications supports the reasonable inference that defendant conducted the searches at his cousin's behest and not pursuant to official police business. Furthermore, defendant alleged to the Lieutenant that he never shared Theresa's motor vehicle or confidential voter registration information with Edwin. *See* N.T. Refiling Hearing, 4/22/21, at 39, 41. These allegations are contradicted by Edwin's appearance at her doorstep four days later and his suspicious claim that he "had his ways" for finding her. *See* N.T.

_____

[17] "At best," defendant argues, "the records showed that the men traded calls but that any 'call' captured by the records was less than two minutes long, and thus likely was not answered and sent to voice mail." Appellee's Brief at 20 n.6, *citing* N.T. Refiling Hearing, 4/22/21, at 64-65. However, he cites the argument of his counsel, not the telephone records themselves, which are not part of the record on appeal. In any case, defendant's argument improperly casts the evidence in a light most favorable to himself. For example, even assuming none of the many calls between the men was more than two minutes long, it is certainly possible to have a brief conversation in this time. At the preliminary hearing stage, we are required to draw this reasonable inference in the Commonwealth's favor. *See Perez*, 249 A.3d at 1102.

Preliminary Hearing, 9/11/20, at 9, 14. The first element of Section 4904(a)(1) is satisfied on this evidence.

There is likewise *prima facie* evidence defendant did not believe his statement was true, thus meeting the second element. Defendant surely would have known if he had in fact spoken with Edwin over the past year, conducted the computer searches for Edwin's personal benefit, and communicated what he learned to Edwin. To the extent his assertions to the contrary in his interview with Lieutenant Clough were fabrications, they were knowingly untrue.

Finally, there is a *prima facie* case defendant intended to mislead Lieutenant Clough in performing his official function. Defendant's apparent repeated fabrications in his statement to the Lieutenant — concerning his past contacts with Edwin, the reason for his computer searches of Theresa, and his communication of her privileged information to Edwin — implied defendant intended to divert or end the Lieutenant's IAD investigation. *See Commonwealth v. Carbone*, 574 A.2d 584, 589 (Pa. 1990) ("The fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they were made with 'an intent to mislead the police or other authorities[.]'"), *quoting Commonwealth v. Gockley*, 192 A.2d 693, 701 (Pa. 1963). His intent to frustrate the IAD investigation is also evident in the fact that he replaced his phone the very same day the Lieutenant interviewed Edwin. *See* N.T. Preliminary Hearing, 9/11/20, at 88. Viewed in the light most favorable to the Commonwealth, the evidence established a *prima facie* case that defendant intended to mislead Lieutenant Clough in performing his internal affairs investigation.

In sum, we conclude the Superior Court committed an error of law when it held the written statement adopted by defendant "does not constitute a 'written false statement'" under Section 4904(a)(1). *Williams*, 302 A.3d at 1244. Moreover, viewing the evidence

under the proper standards, we hold the Commonwealth produced *prima facie* evidence of each of the three material elements of unsworn falsification to authorities under Section 4904(a)(1).

**Tampering with or Fabricating Physical Evidence**

A person commits the crime of tampering with or fabricating physical evidence if, *inter alia*, "believing that an official proceeding or investigation is pending or about to be instituted, he . . . alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation[.]" 18 Pa.C.S. §4910(1).[18] Hence, a crime under Section 4910(1) is made out if the Commonwealth proves a defendant: (1) who believed an official proceeding or investigation was pending or about to be instituted, (2) altered, destroyed, concealed, or removed a record, document, or thing, (3) with the intent to impair the verity or availability of the item to the proceeding or investigation.

The Commonwealth contends the *en banc* Superior Court majority, in concluding the evidence did not establish defendant added the information regarding Theresa to the homicide file after he learned of the IAD investigation, failed to acknowledge that the Commonwealth may sustain its *prima facie* burden by means of wholly circumstantial evidence. It also claims the majority "usurped the role of a trial fact-finder when it opined that the mere fact that 'the second file was not included with the first is not evidence, even at a *prima facie* level, that the [information about (Theresa)] was added after [defendant] learned of the investigation.'" Commonwealth's Brief at 23, *quoting Williams*, 302 A.3d at

---

[18] The Commonwealth argues in its brief there was a *prima facie* case under Subsection (2) of this provision as well as Subsection (1). *See* Commonwealth's Brief at 21-22. However, the Commonwealth charged defendant under Subsection (1) only. *See* Trial Disposition and Dismissal Form at 2; Oral Argument Tr. at 4:20:47-4:21:33, *Commonwealth v. Williams*, J-49-2024 (Sept. 10, 2024) (Commonwealth conceding it charged defendant under Section 4910(1) only). Accordingly, we confine our analysis to whether there is a *prima facie* case under Section 4910(1).

1245. The Commonwealth emphasizes it was not just the mere existence of the second file, but the markedly different content and format of this file, *i.e.*, the file's inclusion of an untraceable and undated printout of Theresa's Facebook profile picture with handwritten notes on the back, which supports an inference of defendant's probable guilt. Indeed, it dubs the second file "a clumsy, after-the-fact addendum to the true file." *Id.* The Commonwealth insists "[a]n entirely reasonable inference from the totality of th[e] evidence is that defendant manufactured the second . . . file to mislead [Lieutenant] Clough in his investigation." *Id.* at 24.

Defendant counters that the Commonwealth has failed to establish any of the three elements of tampering with evidence. He argues his inclusion of information related to Theresa in the homicide file, even if extraneous, hardly constituted the destruction, alteration, or concealment of evidence within the meaning of the statute. "To hold otherwise[,]" he submits, "would subject every law enforcement officer to criminal charges for documenting investigative leads that turned out to be dead ends or otherwise unrelated to the case at hand." Appellee's Brief at 27. In addition, defendant claims that, in the absence of testimony regarding when he printed the Facebook photograph, it is impossible to conclude it was placed in the homicide file after his interview with Lieutenant Clough. As such, he asserts, the Commonwealth did not carry its burden to establish he had the requisite knowledge an investigation was pending into his actions. Finally, defendant contends "there was no evidence that [he] acted with the requisite intent to impair the availability of the item to the proceeding or investigation[.]" *Id.* at 29. Rather, "[t]he information [he] printed and placed in the homicide investigation file remained in the investigation file, and it was therefore accessible to anyone who wished to review it." *Id.*

We find the evidence sufficient to make out a *prima facie* case of each element of tampering with or fabricating physical evidence. First, there is *prima facie* evidence

defendant believed an IAD investigation was pending when he engaged in his allegedly unlawful conduct. At the latest, defendant learned there was a pending IAD investigation into his activities when he gave his statement to Lieutenant Clough on December 27, 2017, as defendant himself acknowledges. *See* Appellee's Brief at 28 ("December 27, 2017 [is] the date that [defendant] was interviewed by IAD and learned that an investigation was pending."). Indeed, defendant's signed statement to the Lieutenant on that date expressly noted at the outset that it took place at the "Internal Affairs Division" and concerned "IAD Investigation 17-533." N.T. Refiling Hearing, 4/22/21, at 30. Immediately after taking defendant's statement, Lieutenant Clough proceeded directly to the Homicide Division, requested the file for the Williams Avenue homicide, and was provided with a single folder. *See* N.T. Preliminary Hearing, 9/11/20, at 77. The Lieutenant then promptly reviewed this folder and determined it contained no information whatsoever regarding Theresa. *See id.* at 78. The very next day, however, defendant called IAD and informed them there was actually a second folder for the Williams Avenue homicide file. *See id.* Unlike the first folder, this second folder contained information regarding Theresa: a publicly available photograph of Theresa with her children printed from Facebook with handwritten notes about Theresa on the back of it.

These circumstances raise a *prima facie* case defendant created the second folder after his interview with Lieutenant Clough, that is, after he believed (indeed knew) an IAD investigation was pending against him. For one, the fact that immediately following defendant's interview with Lieutenant Clough, the Homicide Division provided the Lieutenant with just the first folder indicates this was the **only** existing folder at that juncture. Any extant second folder would have presumably been included with the first, and the Homicide Division would have presumptively disclosed the entire file in response to IAD's request. The fact defendant contacted IAD to advise them of the second folder

also implies it was newly created. If the second folder had existed all along, it is difficult to see why defendant would have deemed it necessary to tell IAD about it. Instead, the logical inference is that he would have simply assumed IAD acquired it along with the first folder when Lieutenant Clough retrieved the file a day earlier.

Further, the distinct nature of the information regarding Theresa — a printout of a publicly available Facebook photo with handwritten notes on the back — suggests a post-interview addendum to the true file. Based on his interview with Lieutenant Clough, defendant knew that if he printed information from a restricted access system like NCIC, VOTE, or JNET, the timing of his search would be evident to IAD. By contrast, a printout of a photo publicly accessible on the internet and handwritten notes were at least more difficult (and perhaps impossible) to date, and presented a potentially undetectable way to supplement the file after the fact. While a different sequence of events is perhaps theoretically possible, the reasonable inference most favorable to the Commonwealth, and hence the inference required under our governing standards of review, is that defendant generated the second folder following his IAD interview, and thus with full knowledge of the pending investigation into his conduct.

There is also *prima facie* evidence defendant altered a record, document, or thing. Initially, as defendant does not appear to dispute, and we readily conclude, the file for the Williams Avenue homicide fits comfortably within the scope of the broad phrase, "any record, document[,] or thing[.]" 18 Pa.C.S. §4910(1). The disputed question is whether defendant altered the file. The word "alter," which is not specially defined by statute or case law, is relevantly defined as "to make different in some particular, as size, style, course, or the like; modify[.]"[19] Based on this definition, we conclude an alteration can be

---

[19] *Alter*, Dictionary.com, https://www.dictionary.com/browse/alter (last visited Jan. 21, 2025).

effected by adding to a record, document, or thing just as it may be effected by deleting from a record, document, or thing. Here, for example, by allegedly adding the second folder to the homicide file, defendant made the file different; he supplemented its contents with a new folder containing additional items. Thus, he altered the file for purposes of the statute.[20]

Lastly, the Commonwealth established a *prima facie* case defendant intended to impair the verity, *i.e.*, the truth, of the homicide file. Again, the printout of the Facebook photograph with the handwritten notes on the back was the only item in the entire homicide file which referenced Theresa. *See* N.T. Preliminary Hearing, 9/11/20, at 79. Unlike a printout from a restricted access database, this item could not be readily traced and dated. It suddenly and suspiciously came to light the very next day after defendant's interview with IAD. The photograph offered corroboration of defendant's claim in his IAD interview that his computer searches for Theresa were conducted pursuant to his investigation of the Williams Avenue homicide. It is reasonably inferred from these circumstances that defendant did not add the second folder to the file because Theresa was a legitimate subject of the homicide investigation, but rather to manipulate the file to give the false impression she was a bona fide part of the investigation to justify his prior computer searches.

In holding otherwise, the *en banc* majority reasoned that since the Commonwealth "presented no testimony from anyone that [Lieutenant Clough] obtained the entire file

---

[20] We reject defendant's claim that this holding "subject[s] every law enforcement officer to criminal charges for documenting investigative leads that turn[ ] out to be dead ends or otherwise unrelated to the case at hand." Appellee's Brief at 27. This position fails to account for the offense's remaining material elements, which require proof the defendant made the alteration with the intent to impair the verity or availability of the item to an official proceeding or investigation the defendant believed was pending or about to be instituted. The mere fact that an officer documented a lead that turns out to be a dead end does not satisfy these other elements.

when he initially procured it[,]" the evidence failed to establish, "even at a *prima facie* level, that the material was added after [defendant] learned of the [IAD] investigation." *Williams*, 302 A.3d at 1245. This reasoning was erroneous for at least two reasons. First, it failed to assign any weight to the evidence the Commonwealth presented. *See id.* ("That the second file was not included with the first is not evidence[.]"). It is well settled that "[t]he weight and credibility of the evidence are not factors at the preliminary hearing stage[.]" *Perez*, 249 A.3d at 1102. Second, in suggesting it was more likely Lieutenant Clough failed to obtain the entire file when he first procured it, rather than that defendant generated the second folder following his IAD interview, the majority disregarded the principle that "[i]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." *Id.*

### Tampering with Public Records or Information

A defendant commits the crime of tampering with public records or information if he "knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government[.]" 18 Pa.C.S. §4911(a)(1).[21] This offense is graded as "a misdemeanor of the second degree unless the intent of the actor is to defraud or injure anyone, in which case the offense is a felony of the third degree." 18 Pa.C.S. §4911(b). Thus, the felony version of this crime is established upon proof the accused: (1) knowingly made a false entry in, or false alteration of, any record, document, or thing (2) belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government, and (3) intended to defraud or injure anyone.

---

[21] The Commonwealth charged defendant under Subsection (a)(1) of Section 4911 only.

The Commonwealth submits defendant added the second folder to the file for the Williams Avenue homicide "knowing it to be false and with the intent to mislead [Lieutenant] Clough in conducting [his] official investigation." Commonwealth's Brief at 25. It also maintains that "[b]ecause defendant himself claimed that the second file was a supplement to the first, official file, the evidence supported the reasonable inference that the fabricated file was a 'false alteration of' the first." *Id.*, *quoting* 18 Pa.C.S. §4911(a)(1).

Defendant responds "the Commonwealth failed to establish that [he] knowingly made a false entry in or alteration" to the homicide file. Appellee's Brief at 30. He alleges "[t]he fact that [he] included his own notes and computer [printouts] related to [Theresa] and her vehicle in the file can hardly be considered a 'false entry' or 'false alteration,' particularly given that there was no evidence to suggest that the information about her residence or vehicle was in any way false or inaccurate, or that the social media profile information attributed to [Theresa] did not in fact belong to her." *Id.* at 31. He additionally asserts the Commonwealth failed to establish his intent to defraud or injure. According to defendant, "an intent to defraud necessarily encompasses an element of pecuniary or property loss, or the loss of an important right[,]" and "the Commonwealth has failed to allege or show how [his] inclusion of information about [Theresa] in a homicide investigation file induced anyone to part with property or forego a legal right." *Id.* at 34.

We hold the evidence is sufficient at the *prima facie* level to support this charge. As discussed, defendant's supplementation of the homicide file with the second folder constituted an "alteration" of the file. The addition of the second folder modified the composition of the file. What's more, from the totality of the suspicious circumstances attending this change — defendant's sudden "discovery," on the very next day after his IAD interview, of a previously unknown second homicide folder containing a difficult-to-

trace document which, uniquely among the items in the file, referenced Theresa and conveniently substantiated his claims in his interview — it is reasonably inferred the alteration was knowingly false.[22] To wit, it purposely and incorrectly indicated Theresa was a genuine part of the investigation of the Williams Avenue homicide, when she in fact had no connection to the case. Furthermore, the file for the homicide was maintained by the Homicide Division of the Philadelphia Police Department. As such, it clearly constitutes a record, document, or thing belonging to, or kept by, the government for information or record. Indeed, on this point, the sharply divided *en banc* panel below unanimously agreed. *See Williams*, 302 A.3d at 1246 ("The homicide file is a 'public record or thing,' as contemplated by the statute, as it is kept by the government and is something that police officers are required to compile."); *id.* at 1257 (Olson, J., dissenting) ("I agree with the learned Majority that the homicide file relied upon by [defendant] to establish the legitimacy of his inquiries regarding [Theresa] is a 'record, document or thing belonging to, or received or kept by, the government for information or record.'").

Finally, we hold there is a *prima facie* case defendant intended to defraud. The legal definition of "defraud" is "[t]o cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money." *Defraud*, Black's Law Dictionary (12th ed. 2024). An "injury" is "[t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice." *Injury*, Black's Law Dictionary (12th ed. 2024). Accordingly, an individual may be deemed to have an intent to defraud if he intends to violate another's legal right or cause a wrong or injustice by deceit. The intent

---

[22] As it did with the previous offense, the *en banc* majority failed to assign the proper weight and inferences to the Commonwealth's evidence on this point. *See Williams*, 302 A.3d at 1247 (suggesting the defendant simply "added his own notes and computer printouts to the file" and chastising the Commonwealth for supposedly relying on "mere supposition and speculation").

to cause pecuniary or property loss is not required. Here, it is reasonably inferred defendant's deceptive manipulation of the homicide file to validate his claims in his interview with Lieutenant Clough was intended to derail the Lieutenant's investigation into his misconduct. Scuttling the investigation would effect a wrong or injustice against Lieutenant Clough and, more broadly, against the IAD, the police department, and the general public. Moreover, by falsely associating Theresa with the Williams Avenue homicide, defendant committed a wrong or injustice against her, and potentially violated her legal rights. In multiple respects, then, defendant evinced an intent to defraud for purposes of Subsection 4911(b), elevating his offense to a felony.

## Obstructing Administration of Law or Other Governmental Function

A defendant is guilty of obstructing administration of law or other governmental function "if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act[.]" 18 Pa.C.S. §5101.[23] As such, a defendant violates this provision if he: (1) intentionally (2) obstructs, impairs, or perverts the administration of law or other governmental function (3) by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act.

Focusing exclusively on the third element, the Commonwealth argues that "[b]ecause the evidence was sufficient to establish a *prima facie* case that defendant committed the 'unlawful act' of unsworn falsification to authorities, the Superior Court majority also erred as a matter of law by holding that the evidence was insufficient to establish the same for obstructing administration of law or other governmental functions." Commonwealth's Brief at 20. Defendant replies that the record "belies" the conclusion he lied to Lieutenant Clough when he told him he had not spoken to Edwin in a year or

---

[23] The exception to liability under Section 5101, *see supra* note 10, is not implicated here.

more. Appellee's Brief at 19. In any event, he insists lying is not an "unlawful act" under Section 5101. In addition, he contends the Commonwealth "provided no evidence at the preliminary hearing to support" that he fabricated the second homicide folder after his IAD interview, and even if it had, any such proof "would not have established the elements for the offense of unsworn falsification[.]" *Id.* at 21-22.

We conclude the Commonwealth adduced *prima facie* evidence of this offense as well. Initially, there is *prima facie* proof defendant intentionally obstructed a governmental function. The IAD investigation into his potential wrongdoing was plainly a governmental function, and his multiple apparent falsehoods in his interview and apparent *post hoc* falsification of the homicide file hindered this function, making it more difficult. Moreover, it is reasonably inferred defendant's repeated falsehoods were not an unlikely series of honest mistakes, but rather an intentional effort to mislead the IAD investigation. The first two elements of the offense are therefore met. So too is the third. As detailed above, there is *prima facie* evidence of three other unlawful acts: unsworn falsification to authorities, tampering with or fabricating physical evidence, and tampering with public records or information. This easily satisfies the third element of the offense. Accordingly, we need not address the *en banc* majority's conclusions that "mere lying" during a police interview and "add[ing] information to the homicide file" do not constitute "unlawful acts" for purposes of Section 5101. *Williams*, 302 A.3d at 1248.

In conclusion, we hold the evidence was sufficient to support a *prima facie* case as to each of the four criminal charges against defendant. The *en banc* majority below — indeed, all the lower courts in this matter — misconstrued the relevant statutes and failed to correctly apply the governing standards. Accordingly, we reverse the order of the Superior Court and remand to the trial court for further proceedings. In so doing, we respectfully remind the lower courts that the weight and credibility of the evidence are not

factors at the preliminary hearing stage, and all reasonable inferences must be drawn in the Commonwealth's favor.

Jurisdiction is relinquished.

Chief Justice Todd and Justices Donohue, Wecht, Mundy and Brobson join the opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.